IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

CHRISTOPHER DEARMON,

          Plaintiff,

      v.

FERGUSON ENTERPRISES, INC.,
a corporation of Virginia,

          Defendant.

Case No. 1:14-cv-01375-CL

**OPINION AND ORDER**

_____

CLARKE, Magistrate Judge.

On August 27, 2014, defendant Ferguson Enterprises, Inc. removed this case to federal court based on diversity jurisdiction. 28 U.S.C. § 1332(a). Plaintiff's Complaint, originally filed in Multnomah County, Oregon, brings claims against the defendant, his former employer, for unlawful discrimination in employment under ORS § 659A.082(2), wage claims under ORS § 652.140 for unpaid overtime, and wrongful termination under Oregon common law. The case is before the Court on defendant's motion for summary judgment (#39) on Plaintiff's first claim for relief. Plaintiff's second and third claims were dismissed with prejudice earlier in the litigation.

For the reasons below, defendant's motion to dismiss (#39) is GRANTED in part and DENIED in part.

## BACKGROUND

Defendant is a national distributor of commercial and residential plumbing supplies. Plaintiff was originally hired by defendant in 2007. Pl.'s Resp. in Opp. To Def.'s Mot. for Summ. J. ("Pl.'s Br.") 3. Less than a year later, plaintiff resigned in order to join the United States Marine Corps. *Id.* However, plaintiff was injured during his initial training and left the Marines. He then applied for and was rehired by defendant in July 2008. *Id.* Plaintiff became an outside salesperson in 2010. *Id.* He was headquartered in Medford, serving surrounding locations, including Roseburg and Eureka, California. *Id.* Dustin Fitzpatrick ("Fitzpatrick") became the branch manager in Medford in March 2011. *Id.* Fitzpatrick supervised plaintiff and one other outside salesperson in Medford, David Carter ("Carter"). *Id.*

Defendant's outside salespeople are paid a uniform base salary as well as a sales commission. *Id.* The commissions are not based entirely on gross sales, and cannot be determined solely by looking at a customer's sales volume. *Id.* Different products sold by defendant have different margins, which impact the commissions salespeople earn from a given customer. *Id.* at 4-5. A customer who purchases a higher-margin product will trigger higher commissions than a customer with the same sales volume but purchasing lower-margin products. *Id.* at 5. Plaintiff and Carter each had a list of customer accounts they earned commissions from. *Id.* Accounts were added and subtracted from their respective lists for various reasons, including by request of the salespeople themselves, and at the behest of managers, who primarily changed account lists during a yearly account review process. *Id.*

Sometime prior to 2013, plaintiff became unhappy with traveling to Eureka, and asked his managers if Eureka could be removed from his service area. *Id.* at 3. At his request, plaintiff's managers began the process of phasing him out of the Eureka market. *Id.* at 3-4. Eventually, plaintiff and defendant agreed to keep plaintiff in the Eureka service area, but on a reduced schedule. *Id.* at 13. During this time, some Medford accounts were also added to plaintiff's accounts list. *Id.*

On February 15, 2013, plaintiff informed Fitzpatrick and general manager Gregg Burback ("Burback") that he had enlisted in the Oregon Army National Guard. *Id.* at 5-6. Plaintiff alleges that while Fitzpatrick was generally receptive, Burback's response was negative. *Id.* at 6; Def.'s Mot. for Summ. J. ("Def.'s Br.") at 6. Specifically, plaintiff alleges that Burback said that plaintiff's military service would hinder business, and that if plaintiff decided to take a more active role in the National Guard, Burback "would be done with him." Pl.'s Br. 6. A few days later, Burback emailed one of defendant's human resources employees, asking how and what defendant was obligated to pay plaintiff while he was away for ten weeks of military training. *Id.* Plaintiff alleges Burback informed plaintiff he would have to use his vacation time to attend National Guard training. *Id.* Burback also allegedly referred to the National Guard as a "cult" to another employee. *Id.* at 10.

On February 22, 2013, plaintiff spoke again with Fitzpatrick about enlisting. *Id.* at 6. He and Fitzpatrick discussed the possibility that plaintiff would split up his training in order to make his absence easier on defendant. *Id.* at 6-7. It was plaintiff's idea to ask his recruiter about splitting up his training. *Id.* at 7.

In the spring of 2013, plaintiff alleges he attended three separate meetings with Fitzpatrick and Burback, where he was told he was not performing adequately. *Id.* at 9. Plaintiff alleges that he was reprimanded for not staying in contact with certain customers. *Id.*

In May 2013, plaintiff received his yearly performance review from Fitzpatrick. *Id.* He received the same overall score that he received in 2012; however, plaintiff alleges the 2013 review included insinuations regarding plaintiff's loyalty to the company. *Id.* at 9-10.

In July 2013, plaintiff's and Carter's account lists were reviewed by Fitzpatrick and sales manager Raymond Collins ("Collins"). *Id.* at 7. At no time did plaintiff ever discuss his military service with Collins, and plaintiff does not believe Collins had any concerns with him enlisting. *Id.* Collins made account change decisions to both plaintiff and Carter with input from Fitzpatrick. *Id.* at 5. Plaintiff alleges Burback also provided input in account change decisions. *Id.*

Following the July 2013 account review, accounts were removed from both plaintiff's and Carter's lists. *Id.* at 7-8. Plaintiff lost approximately 19 accounts in this process. *Id.* at 9. Plaintiff alleges that his accounts were removed in a manner that had a much more significant impact on his income than accounts those removed from Carter. *Id.* at 8. Between July and September 2013, plaintiff also had accounts added to his list, though plaintiff alleges the new accounts did not compensate for the income he lost due to account removal. *Id.* at 8-9.

Plaintiff did not complain about his treatment to defendant's management or human resources. *Id.* at 10. Plaintiff eventually resigned in September 2013. *Id.* Plaintiff avers that he did not resign immediately because defendant's payment schedule is such that sales commissions may not be paid as income to salespeople until months after a given sale. *Id.* at 10, 14. Plaintiff believed that he would be impacted by his loss of sales accounts in the fall of 2013. *Id.* at 15.

## STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## DISCUSSION

Pursuant to the prior dismissal order, plaintiff's remaining claim for relief is brought under ORS 659A.082, which establishes protection for service members from discrimination by an employer, including "[d]ischarging, expelling, disciplining, threatening, or otherwise retaliating against the person for exercising or attempting to exercise the status or rights provided

by this section." ORS 659A.082(2)(c). The express language of ORS 659A.082(4) provides that it shall be construed and operate in a manner consistent with the federal Uniformed Services Employment and Reemployment Rights Act of 1994 ["USERRA"].

Under USERRA, plaintiff has the initial burden of showing by a preponderance of the evidence that (1) he was subject to an adverse employment action; and (2) his uniformed service status was a "substantial or motivating factor" of that action. 38 U.S.C. § 4311(c); *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001). If the plaintiff meets the initial statutory requirements, the burden shifts to the employer to show, by a preponderance of evidence, that the adverse employment action would have been taken for a valid reason, regardless of plaintiff's uniformed service status. *Id.* (internal citations omitted).

An adverse employment action is a "significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *See Wehrli v. Tempe Union High School Dist.*, *available at* 2014 WL 1202954, at *4 (D.Ariz. March 24, 2014) (quoting *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998)). Plaintiff alleges that because he enlisted in the National Guard, he was subjected to the following adverse employment actions: (1) disparaging remarks by management; (2) performance reprimands from management; (3) reducing the number his customer accounts, resulting in; (4) loss of income; and (5) disparate treatment. Pl.'s Br. 2; Pl.'s First Amended Complaint ("Compl.") ¶¶ 13, 16-18. Defendant maintains no adverse employment action occurred, but, alternatively, to the extent an adverse employment action did occur, it was not motivated by plaintiff's military status. Def.'s Br. 2.

I.      *Disparaging Remarks*

Plaintiff alleges that following his February 2013 announcement that he enlisted in

the National Guard, he was subjected to disparaging comments by defendant's management. Plaintiff argues he first informed his direct supervisor, Medford branch manager Fitzpatrick that he enlisted, who apparently was "very receptive" to the news, but indicated plaintiff should be the one to inform general manager Burback, who was stationed in Portland. Plaintiff asserts he called Burback, who had a negative response to the news, stating his military service would "hinder business in Medford," and if plaintiff "decided to take a more active role in the Guard, Mr. Burback would be done with him." Pl.'s Br. 5-6. Plaintiff also alleges Burback said he had made "a bad career move," he could not be "part-time Army and expect to move up in the company," and Burback would take plaintiff's decision to enlist into consideration when considering future promotions. *Id.* at 12. Plaintiff further alleges Burback likened the National Guard to a "cult" in conversation with another of defendant's employees. *Id.* at 10. Finally, plaintiff alleges he was informed by Burback that he would be required to use his vacation time to meet his military obligations. *Id.* at 12. Defendant either denies or does not recall making the statements; however, defendant agrees, for the purposes of this motion, to assume Burback made the alleged statements. Def.'s Br. 7, 10. Thus, to the extent Burback participated in an alleged adverse employment action, inference of discriminatory intent as to Burback is reasonable when viewing the evidence in a light most favorable to plaintiff.

Additionally, plaintiff argues Fitzpatrick made disparaging remarks about plaintiff's 2008 enlistment in the U.S. Marine Corps, although his enlistment ultimately resulted in plaintiff's return to defendant's employment following an injury incurred during training. Pl.'s Br. 11-12. According to plaintiff, he informed Fitzpatrick in a private meeting that he had decided to resign in order to join the Marines full-time, and Fitzpatrick responded, "he thought I 'was making a big mistake' for my career . . . ." Decl. of Christopher Dearmon in Supp. of Pl.'s Resp. in Opp. to

Def.'s Mot. for Summ. J. ("Dearmon Decl.") ¶¶ 6-8. Defendant argues that plaintiff failed to mention a private meeting during his deposition despite being specifically asked what he said during his resignation meeting about joining the military. Def.'s Reply 3-4; *see Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("[A] party who has been examined at length on deposition [cannot] raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony."). The court agrees; when asked what plaintiff told defendant's managers when he quit defendant's employ to enlist in 2008, plaintiff testified:

> I gave him my two weeks notice and then I stayed there for three or four weeks to help them out in a transition phase. And I told him that I was leaving to join the Marines, to go to officer candidate school. It was actually I quit through Dustin Fitzpatrick . . . .

Supp. Decl. of Jennifer Warberg in Supp. of Def.'s Mot. for Summ. J. ("Warberg Supp. Decl."), Ex. 4, p.1. Plaintiff did not mention Fitzpatrick said anything further about plaintiff's decision to leave the company. In response to defendant counsel's follow-up question, plaintiff indicated he did not have any complaints about the way he had been treated during his first period of employment with defendant. *Id.* Further, even assuming Fitzpatrick did make the alleged statement, it is not sufficient to infer any discriminatory motive, particularly given the undisputed facts that plaintiff was later rehired by defendant and that Fitzpatrick was "very receptive" when plaintiff revealed he was joining the National Guard five years later. Decl. of Jennifer Warberg in Supp. of Def.'s Mot. for Summ. J. ("Warberg Decl.") Ex. 1, p.16-17. Accordingly, the court disregards the allegations in Dearmon Decl. ¶¶ 6-8. *Kennedy*, 952 F.2d at 266. Plaintiff has not presented persuasive evidence that Fitzpatrick harbored any discriminatory animus regarding plaintiff's decision to join the military in 2008.

II.    *2013 Performance Evaluation*

A warning letter or negative review may be considered an adverse employment action. *Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)). In May 2013, roughly two months after plaintiff informed defendant that he joined the National Guard, plaintiff received his yearly performance review, completed by Fitzpatrick. *Id.* The parties agree that plaintiff received the same performance rating – 3.71 – that he did the preceding year. *Id.* However, plaintiff argues that narrative comments included in the review expressed Fitzpatrick's view that plaintiff's military service was causing him to be disloyal to defendant, as no such comments were made in the previous review. *Id.*; Warberg Decl., Ex. 1, p.52; Decl. of Benjamin T. Ybarra in Opp. to Def.'s Mot. for Summ. J. ("Ybarra Decl."), Ex. 2. Specifically, the passage states: "[Plaintiff] has a lot going on in personal life and I am concerned where [defendant] fits in. I think he is an honest person, but concerned that maybe we are down on the list. We have spoke [sic] about it and he has assured me that is not the case." Warberg Decl., Ex. 1, p.52.

In contrast to the 2013 review, Mr. Fitzpatrick's 2012 comments beneath the heading "Integrity and Commitment," indicated plaintiff was rated a 4.00, and Mr. Fitzpatrick noted he had "never questioned [plaintiff's] integrity and commitment to the company." Ybarra Decl. Ex. 2, p.2. Thus, one can infer that at some time between the yearly reviews of 2012 and 2013, Fitzpatrick's appraisal of plaintiff's commitment to his job changed. Assuming for the purposes of this motion that the change precipitating Fitzpatrick's comment was plaintiff's decision to enlist, it can be said that plaintiff's overall review was impacted by plaintiff's military service. Plaintiff contends his three-out-of-four score for integrity and commitment constitutes an "unprecedented reprimand." Pl.'s Br. 2. However, the performance review's own terms define

plaintiff's 3.00 rating as "Consistently meets expectat[io]n[s]." *See* Warberg Decl., Ex. 1, p.52; Ybarra Decl. 2, Ex. 2, p.2. Thus, the score for "integrity and commitment" was lower than the previous year's 4.00 rating ("Cons[istently] meets and often exceeds exp[ectations]). *Id.*

While plaintiff's 2013 score for the category was lower, an objectively satisfactory review cannot reasonably be called a "warning" or a "negative review" as described in *Fonseca*, nor is it a "reprimand" or "accusation." At worst, Fitzpatrick indicated plaintiff's work consistently met expectations, and overall provided performance score identical to that of the previous year's. *Id.* Moreover, there is no dispute that the 2013 performance review was not a "significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Wehrli*, *available at* 2014 WL 1202954, at *4. Thus, the May 2013 performance evaluation was not, without more, an adverse employment action.

III.    *Management of Sales Accounts*

In 2012, plaintiff lived in Medford, but serviced client accounts in both Medford and Eureka, where he would, on occasion, spend three to four days per week. Pl.'s Br. 13. Unhappy with his out-of-state travel responsibilities, plaintiff requested fewer Eureka accounts. *Id.*; Def.'s Br. 4. Accordingly, plaintiff's Eureka accounts were decreased; the parties dispute whether plaintiff was then given additional Medford accounts to make up for the lost Eureka accounts. Eventually, plaintiff and management agreed plaintiff would keep his Eureka accounts, and following his account review in 2013, some of his Medford accounts were removed.

As a threshold matter, the parties dispute which of defendant's managers were involved in adding and removing sales accounts from its outside salespeople. *Id.* Plaintiff alleges Fitzpatrick, Burback, and sales manager Collins were involved in the decision to remove 19

customer accounts from plaintiff's list. *Id.*; Dearmon Decl. ¶¶ 14, 15, 44, 47, 50, 58. Defendant contends the allegation Burback was involved in account reviews had not previously been raised and contradicts his earlier deposition testimony. Plaintiff argues, pursuant to *Kennedy*, this allegation should be disregarded. Def.'s Reply 6-7. Defendant's argument is not completely accurate, as plaintiff previously alleged Burback exercised power over decision-making processes regarding sales accounts. *See, e.g.*, Compl. ¶ 16 ("Burback stripped Plaintiff of several customer accounts"). Nevertheless, defendant is correct in asserting plaintiff previously indicated he spoke to Fitzpatrick, rather than Burback, in 2012 regarding accounts in Eureka. Warberg Supp. Decl. Ex. 1, p.3. Thus, the court disregards ¶¶ 14 & 15 of the Dearmon Decl. per *Kennedy*.

Defendant further requests the court disregard plaintiff's assertions that Burback was involved in account reviews at all, as the assertion contradicts the otherwise undisputed testimony of Collins and salesperson Carter that Collins conducted account reviews and made "final decisions" about them. Collins Decl. ¶¶ 4-6; Carter Decl. ¶ 5; Dearmon Decl. ¶ 58. Defendant concedes plaintiff has presented evidence that Burback requested changes on accounts *unrelated* to plaintiff's at least twice. *See, e.g.*, Ybarra Decl. Exs. 3, 6. However, plaintiff has failed to provide relevant evidence Burback made any requests or changes regarding plaintiff's own accounts. While the evidence proffered establishes that Burback conceivably *could* have directed the account activity at issue, it does not give rise to the reasonable inference that the conduct occurred in fact, and thus the evidence is insufficient as a matter of law. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011); *see also Hansen v. U.S.*, 7 F.3d 137, 138 (9th Cir. 1993) (*per curiam*) (a nonmoving party relying only on its own affidavit cannot rely on conclusory allegations unsupported by factual data to create an issue of

material fact) (citations omitted). Accordingly, the court disregards the allegations set forth in paragraphs 44, 47, and 58 of the Dearmon Decl.

IV.    *Impetus for Sales Account Changes*

Aside from the issues of Burback's alleged involvement sales account management, the parties dispute the impetus for the removal of the Medford accounts. Plaintiff argues the accounts were stripped from him in retaliation for his committing to the National Guard, which resulted in prospective loss of income. Pl.'s Br. 13-15; 17-18. Defendant asserts the accounts were removed for legitimate business reasons, and that any disputed facts on the issue are not material to the instant motion. Def.'s Br. 8-9.

Plaintiff contends defendant removed plaintiff's sales accounts discriminatorily. Employment actions carried out in retaliation against an employee's military status is prohibited by USERRA. Bearing in mind the discussion in the previous section, allowable evidence directs that Collins and Fitzpatrick were the decision-makers in adding and/or subtracting sales accounts, with Collins having the final say. Def.'s Br. 8; Pl.'s Br. 7; *supra* at III. Plaintiff does not allege that Collins "had any concerns with him joining the National Guard," and therefore, in the absence of discriminatory intent, any employment action taken at the behest of Collins is not cognizable under USERRA. *See* Dearmon Decl. ¶¶ 56-57. Accordingly, the sole remaining party to whom discriminatory intent could be ascribed in removing plaintiff's accounts in 2013 is Fitzpatrick. Indeed, plaintiff alleges Collins' decisions were based on feedback from himself, Burback, and Fitzpatrick, as Collins did not "challenge" requests to add or subtract sales accounts. *Id.* at ¶ 58.

//

//

V.   *Loss of Significant Accounts*

As explained above, the parties agree Fitzpatrick was "receptive" to plaintiff's decision to begin military service in 2013. Plaintiff also agrees Fitzpatrick reacted positively to plaintiff's suggestion he request his National Guard training be broken into two separate stints in order to better accommodate his responsibilities at work. Pl.'s Br. 7. Nevertheless, plaintiff alleges that the removal of certain accounts was retaliatory, and resulted in plaintiff prospectively losing significant income.

Plaintiff argues that during the spring of 2013, he had three separate conversations with Fitzpatrick and/or Burback and/or Collins regarding performance issues. Pl.'s Br. 9; Warberg Decl., Ex. 1, pp.24-25. The parties differ on the tone of these meetings, but generally agree plaintiff was at least informed that certain clients reported they were not being "called-on" by plaintiff. Def.'s Br. 9. Thereafter, 19 accounts were removed from plaintiff, which allegedly affected his earnings. Pl.'s Br. 8-9.

During his deposition, plaintiff cited four critical accounts: Van Row Mechanical ("Van Row"), Whitehorn Construction ("Whitehorn"), Logan Plumbing (aka Shaun Lesina) ("Logan"), and Patterson Plumbing ("Patterson"), as particularly impactful to his income. Pl.'s Br. 8. The parties disagree about how plaintiff came to service the Medford accounts of Van Row and Patterson, and why the accounts were rescinded. Def.'s Br. 8 n.6; Pl.'s Br. 8; Dearmon Decl. ¶¶ 46-48. Defendant argues those two accounts were removed for two non-discriminatory reasons: (1) because those clients stated they did not require an outside salesperson; and (2) accounts had been given to plaintiff when he informed management he wished to stop serving Eureka

accounts, a decision he ultimately reneged.[1] Def.'s Br. 8 n.6. Plaintiff maintains he was given the

Van Row and Patterson accounts as part of an agreement whereby he would continue to travel to

Eureka, although less frequently, and the accounts were added to offset his lost profits in Eureka.

Dearmon Decl. ¶¶ 20-21; 46-48.

Defendant has proffered evidence that Van Row and Patterson both declined to continue

to have an outside salesperson assigned to their accounts. Jason Rowan, one of the owners of

Van Row, indicated he contacted Fitzpatrick in 2013 and informed him he no longer wanted an

outside salesperson. Decl. of Jason Rowan, pp. 1-2. He further testified Van Row does not have

an outside salesperson with defendant as of July 2015. *Id.* Similarly, the owner of Patterson,

Gregg Seyboth, testified that he prefers not to work with defendant via an outside salesperson, as

he prefers not to be called on. Decl. of Gregg Seyboth, pp.1-2. Accordingly, defendant has

provided a valid, non-discriminatory reason, supported by sworn affidavits, for the removal of

the Van Row and Patterson accounts. Moreover, plaintiff does not dispute that both Van Row

and Patterson stated they no longer desired an outside salesperson. As such, plaintiff's allegation

the accounts were removed for discriminatory reasons is unavailing.

Defendant has also proffered evidence of valid reasons for removing the Logan and

Whitehorn accounts from plaintiff. Defendant argues the Logan and Whitehorn accounts were

removed following a string of emails between plaintiff and Collins in July 2013 during the time

of plaintiff's account review, in which Collins requested information on call frequency,

relationship status, and growth potential of the accounts. Warberg Supp. Decl. Ex. 1, pp.23-29.

The emails indicated plaintiff "did not feel [he] ha[d] a great relationship" with the Logan

---

[1] Defendant's position regarding Van Row and Patterson is supported by the deposition testimony of Fitzpatrick, Burback, and Collins. Warberg Decl., Ex. 3, pp.20-21; Ex. 4, pp.10-12; Ex. 5, pp.6-9.

representative, Shaun Lesina. *Id.* at 24. Regarding Whitehorn, plaintiff indicated he no longer called on the account often. *Id.* Consistent with the email exchange, Collins testified that removal of the Whitehorn account "had everything to do with [plaintiff's] own answer to [Collins] on the account review." Warberg Decl., Ex. 5, pp.10-11, 16. Moreover, plaintiff appeared to agree the accounts were taken for dubious reasons. When plaintiff was asked to explain the email exchanged with Collins discussing the Logan and Whitehorn accounts, he testified, "I don't think that he took these accounts from me . . . unless I stated to take it." *Id.* at Ex. 1, pp.15-16. Plaintiff does not dispute defendant's proffered legitimate business reasons for removing the Whitehorn and Logan accounts, and therefore any general allegations of discriminatory animus regarding those accounts is unavailing. *See* Dearmon Decl. ¶ 40.

VI.    *Lost Income and Disparate Treatment*

Aside from the four largest accounts discussed above, the parties agree that other accounts were also removed from plaintiff in 2013. Plaintiff alleges that pulling his accounts was disproportionate to similarly situated salespeople, resulting in discriminatory disparate treatment and a significant drop in income. Defendant argues plaintiff has not presented evidence of any actual loss of income, his allegations regarding prospective lost income are not probative, and he cannot show disparate treatment.

A. *Lost Income*

Defendant argues plaintiff cannot show he suffered an adverse employment action through lost income or benefits. In support, defendant provides a chart showing plaintiff's commissions versus the commissions of fellow region salesperson Carter from Fall 2012 until

Fall 2013. Def.'s Br. 4-5.[2] The information shows defendant usually earned significantly more in commissions than Carter. *Id.* The chart also reveals that plaintiff averaged significantly more commission income following his announcement to join the National Guard in February 2013, a point which plaintiff does not dispute. *See id.*, Pl.'s Br. 15. Defendant further contends that "outside sales are not based entirely on gross sales and one cannot, therefore, determine commissions by looking solely at a customer's sales volume." Def.'s Br. 5. Further, based on testimony from Collins, defendant contends, and plaintiff concedes, that "[d]ifferent products have different margins which impact the commissions outside salespeople can earn for any given customer . . . a customer who tends to purchase product with high margin will trigger higher commissions than another customer with the same level of sales but lower margin products." *Id.*; Pl.'s Br. 4-5.

While plaintiff agrees his commissions actually increased after informing Fitzpatrick and Burback of his decision to enlist, he contends defendant's particular pay schedule results in a delay whereby account changes are reflected in a salesperson's income months after the fact. Pl.'s Br. 14-15. Essentially, argues plaintiff, defendant's salespeople were not paid commissions until their clients paid their invoices, which meant that commissions might not be earned by a salesperson until 90 or more days after a purchase was made. Pl.'s Br. 14. Thus, argues plaintiff, "the effect of the accounts takes from [plaintiff's] account list on July 31, 2013 would have not affected [plaintiff's] overall compensation until October and November 2013." *Id.* at 15. Defendant does not dispute that commissions were sometimes not paid until 90 or more days after a client purchased a product. Plaintiff contends he waited until the removed accounts would

---

[2] The parties agree both plaintiff and Carter made $2,400 per month in base salary in addition to the described commissions.

begin to impact his income before terminating his employment, although the removal of the accounts was the impetus for his resignation. *Id.*

In support, plaintiff proffers the testimony of CPA William Douglas ("Douglas"). Douglas provides analysis which concludes, in part, that the accounts removed from plaintiff after February 2013 constituted 26% of his total sales, and 20% of his total gross profit for the year-to-date ending June 2013. Decl. of William Douglas ("Douglas Decl.") ¶¶ 5-6. Thus, argues plaintiff, the removal of his accounts would have eventually resulted in the loss of 20% of his annual commission, for a total of $11,151. *Id.* ¶ 6.

Defendant argues that Douglas' analysis is predicated on two erroneous assumptions, and therefore should be disregarded. First, in determining plaintiff's total commissions, Douglas noted, "I did not recalculate commission because details necessary were not provided and because doing so would not be cost effective." Douglas Decl. ¶ 4. Thus, rather than using defendant's actual calculation method to determine plaintiff's commissions, Douglas, based on his "reading of the plan and [his] experience," instead concluded "there is a direct correlation between sales, gross profit and commission such that a change in sales and/or gross profit would also change commission proportionately[.]" *Id.* Douglas' underlying assumption of a proportional correlation between "sales and/or gross profit" and commissions, however, appears to be at odds with defendant's actual calculation method, which the parties agree is such that "outside sales are not based entirely on gross sales, and one cannot, therefore, determine commissions by looking solely at a customer's sales volume." Def.'s Reply 11; Pl.'s Br. 4. Thus, given that one cannot determine plaintiff's commissions based on sales volume, the court questions whether a 20% reduction in gross profit would also reduce commissions by 20%, as plaintiff contends. *See* Douglas Decl. ¶ 6.

B. *Disparate Treatment*

Defendant also argues that Douglas' analysis is flawed in its comparison of accounts taken from plaintiff and accounts taken from other outside salespeople in July 2013. The parties agree that plaintiff was not the only salesperson who had accounts removed at the 2013 account review. *See, e.g.*, Pl.'s Br. 12. Plaintiff, supported by Douglas' findings, asserts that he lost a significantly greater percentage of "total sales" (sales plus gross profits per sales account removed) than any of defendant's other salespeople. Douglas Decl. ¶ 5. In calculating the total sales lost, Douglas indicated he included plaintiff's Patterson account, even though Patterson was removed prior to July 2013. *Id.* Defendant argues that by including the large volume Patterson account in the comparison, Douglas' results were skewed, as the other salespeople's numbers included only accounts removed after July 2013. Def.'s Reply 10-11. Presumably, defendant disputes the inclusion of the Patterson sales because (1) Patterson was not removed for discriminatory reasons, and (2) it is plausible that other salespeople also had accounts removed before July 2013 that were not included in Douglas' calculations. Finally, defendant notes that Douglas' findings did not contemplate the addition of sales accounts, changes in client purchase volumes, or changes in product makeup that could impact margins. Def.'s Br. 12.

Defendant's arguments are well taken. However, as recited at the outset of this opinion, the court "cannot weigh the evidence or determine the truth[,] but may only determine whether there is a genuine issue of fact." *Playboy Enters., Inc.*, 279 F.3d at 800. Thus, to the extent defendant urges the court to find the conclusions set forth by Douglas unreliable, neither the *strength*, nor the *truth* of the evidence is within the court's purview at this stage. Rather, the court may only determine whether there is a genuine issue of material fact. Further, the court must view the proffered evidence in the light most favorable to the plaintiff. *Allen*, 66 F.3d at

1056. Thus, while the court recognizes defendant's arguments regarding the strength of the comparative analysis, it was nonetheless proffered by a professional who the court presumes to be an expert in the field of accounting investigations, and whose conclusions are at least based on factual information regarding defendant's compensation policies and records. Douglas' analysis is explained in detail, and regardless of its reliability, its conclusion is clear: the removal of plaintiff's accounts affected his overall compensation more than other similarly situated employees, which reasonably allows the inference that the continued absence of the accounts would disproportionately impact plaintiff's earnings moving forward. *See* Douglas Decl. ¶¶ 5, 6. In short, Douglas' analysis illustrates disparate treatment. Moreover, even if defendant persuasively presented legitimate business reasons for the removal of the four "primary" accounts discussed above (Van Row, Patterson, Logan, Whitehorn), there is no dispute that at least fifteen additional accounts were removed, which could still represent a disproportionate percentage of plaintiff's income compared to other salespeople. By establishing plausible evidence of disparate treatment, the court may infer discriminatory motivation on defendant's part. *See Leisek v. Brightwood Corp.*, 278 F.3d 895 (2002) (under USERRA, discriminatory motivation of the employer may be reasonably inferred from a variety of factors, including disparate treatment of certain employees to other employees with similar work records or offenses). The appropriate factual determination in this case will most likely require further expert testimony which can then be weighed by a jury. Defendant's disagreements with Douglas's report must wait until the next stage of litigation.

VII.    *Constructive Discharge*

Finally, plaintiff alleges he was constructively discharged from defendant's employ. Constructive discharge requires that plaintiff show "the abusive working environment became so

intolerable that resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004). The Ninth Circuit requires a plaintiff establish that the employer "create working conditions that are 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood.'" *Poland v. Chertoff*, 494 F.3d 1174, 1186 (9th Cir. 2007) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)). The Ninth Circuit has established a high bar for constructive discharge claims, stating "antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then litigates whether his employment situation was intolerable." *Id.* (citation omitted). Accordingly, the *Poland* court noted that "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Id.* at 1185; *see also Marrazzo v. Leavitt*, 719 F.Supp.2d 1297, 1305 (D.Or. June 21, 2010).

Plaintiff argues he was subjected to an "increasingly hostile" work environment after first becoming aware of defendant's "animus toward the military" in February 2013. Pl.'s Br. 20. According to plaintiff, "the abuse became intolerable" by July 31, 2013, when "he realized that his compensation would be significantly affected." *Id.* Plaintiff explains that he did not resign until September 2013 in order to avoid further economic loss based on defendant's delayed commission payment structure. *Id.*

Plaintiff's argument fails on two fronts. First, following the time plaintiff indicated his alleged workplace abuse had become intolerable by July 13, 2013, there is no dispute that plaintiff's income increased after July 2013, and plaintiff has not presented any concrete evidence on the amount of income he would prospectively lose, as Douglas' analysis does not

include accounts added, or that plaintiff indicated he felt he would have "continued to grow his accounts," so any argument that income loss caused an intolerable working condition at the time of his resignation is too speculative to meet the high threshold. Pl.'s Br. 8; Warberg Supp. Decl. Ex. 1, p.21.

Plaintiff further argues that the meetings he attended with Fitzpatrick and Burback, where they informed him that his performance was subpar, created an intolerable situation. Warberg Decl., Ex. 1, pp.39-40. However, there is no dispute that the accounts Fitzpatrick discussed with plaintiff at the meetings were *not* removed from plaintiff's account list. Pl.'s Br. 9. Even if the meetings with Fitzpatrick and Burback included *unwarranted* reprimands for poor performance, such a meeting does not meet the high threshold of objectively extraordinary and egregious conduct on defendant's part. Indeed, as the Ninth Circuit has explained, "[w]here a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible . . . to meet the higher standard of constructive discharge[.]" *Brooks*, 229 F.3d at 930; *see also Manatt v. Bank of America*, 339 F.3d 792, 798 (9th Cir. 2003) (no hostile work environment despite coworkers using the phrase "China man" and pulling their eyes back with their fingers to mock the appearance of Asians); *Vazquez v. Cty. of Los Angeles*, 307 F.3d 884, 893 (9th Cir. 2002) (no hostile work environment where employee was told he had "typical Hispanic macho attitude" and that he should work in the field because "Hispanics do good in the field"). Moreover, despite defendant's delayed commission compensation structure, that plaintiff did not quit immediately suggests defendant's workplace was not so intolerable that a reasonable person would have felt forced to quit.

Second, plaintiff concedes he did not notify any of his managers nor human resources of discrimination based on his military status. Warberg Decl. Ex. 1, p.4. Rather than address his

concerns with defendant, plaintiff agrees that he made no complaints, but rather "waited patiently" until September 2013 to tender his resignation. Pl.'s Br. 21. Plaintiff alleges he did not complain because there was "no one [he] could turn to," however, plaintiff also indicated that he had a fairly good relationship with Fitzpatrick, felt that Collins did not harbor any animus about his military service, and had previously sought and received assistance from Eureka branch manager Nick Machado. Pl.'s Br. 6-7, 14. Moreover, while plaintiff alleges that defendant's intolerable treatment included, in part, taking away his "most valuable accounts," he also concedes defendant never refused to add sales accounts to his list, that Collins added accounts to his list at plaintiff's request, and that he never requested any large accounts be added to his list. *Id.* at 8, 21; Warberg Suppl. Decl. Ex. 1 p.12-13. Accordingly, plaintiff's contention that he allowed defendant "time" to correct its allegedly discriminatory activity is not sufficient. Pl.'s Br. 21. For these reasons, plaintiff's constructive discharge claim fails as a matter of law.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is GRANTED in part and DENIED in part. The motion is GRANTED with regards to plaintiff's claim for constructive discharge. The motion is DENIED with regards to plaintiff's disparate treatment claim.

IT IS SO ORDERED and DATED this _____28_____ day of October, 2015.

_____

MARK D. CLARKE
United States Magistrate Judge